**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO**

IN RE:

ACEMLA DE PUERTO RICO INC.,

              Debtor

Case No. 17-02021 ESL

Chapter 11

OPINION AND ORDER

This case came before the court on March 20, 2018, and continued to March 22, 2018, to consider the Final Approval of the Disclosure Statement filed by ACEMLA de Puerto Rico Inc. ("ACEMLA"), and the confirmation of the chapter 11 plan. The court also heard the parties' arguments on the following matters: (a) Motions for Allowance of Administrative Expenses filed by Spanish Broadcasting System, Inc. ("SBS") and Broadcast Music Inc. ("BMI") and Debtor's Opposition to the same. (Dockets Nos. 380, 383, 384, 387 and 391); (b) Motions for Conversion to Chapter 7 filed by Peer International Corporation of Puerto Rico ("Peer") and SBS (Dockets No. 396 and 400), and Motion to Dismiss with prejudice filed by the Sucn. Catalino Curet Alonso (Docket No. 438).

Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(L). Venue of this proceeding is proper under 28 U.S.C. §§ 1408 and 1409.

-1-

Procedural Background

On March 24, 2017, ACEMLA de Puerto Rico Inc. filed a voluntary petition under chapter 11 (Docket No. 1). On that same date, a corporate resolution was filed, stating that the Board of Directors of ACEMLA de Puerto Rico, Inc., had decided to file a petition for relief under Chapter 11 of the Bankruptcy Code, and authorizing the retention of Victor Gratacós, Esq., if approved by court. (Docket No. 2). An application to employ Gratacós Law Firm P.S.C. as legal representative was filed on March 27, 2017. (Docket No. 4). Furthermore, the Debtor requested an administrative consolidation with case no. 17-02023, filed by the Debtor Latin American Music Corporation Inc. ("LAMCO"), considering that the Debtors had "unity of interests and the same unsecured creditors" and in order to "reduce costs" and "simplify" the administrative aspects of the cases (Docket No. 5). On March 29, 2017, the Debtor filed its *Motion for Entry of an Order Authorizing the Filing of Licenses Agreements Under Seal* (Docket No. 10), which was granted on March 31, 2017 (Docket No. 12). On April 3, 2017, ACEMLA filed the case schedules and statement of financial affairs. (Dockets Nos. 16 and 17). On that same date, The Debtor filed its *Motion in Compliance with Local Bankruptcy Rule 4002-1* (Docket No. 18). Furthermore, on April 7, 2017, the Debtor filed its *Motion in Compliance with §1116* (Docket No. 20).

On April 12, 2017, the Estate of Catalino "Tite" Curet-Alonso ("Tite Curet Estate") filed a *Motion Requesting Relief From Order to File Licenses Under Seal or in the Alternative Authorization to Review Them* (Docket No. 21), alleging that the Debtor was using the Bankruptcy Court as a "safe h[]aven" in order to sidestep several orders of the Puerto Rico District Court which required ACEMLA to produce the music license agreements, among other documents. The Tite Curet Estate requested access to the documents filed under seal (Docket No. 21). On April 19, 2017, the Debtor opposed to the Tite Curet Estate's request (Docket No. 23). Furthermore, on April 18, 2017, the court granted the administrative consolidation of the cases, as unopposed (Docket No. 22). Additionally, and although the Tite Curet Estate requested *Leave to file a Sur-Reply* to the *Debtor's Opposition to Motion Requesting Relief from Order to File Licenses Under Seal* at Docket No. 26, on April 26, 2017, the court granted the relieve requested by the Tite Curet Estate allowing the heirs to access the Debtor's licenses. (Docket No. 27).

On April 26, 2017, the court approved the employment of Victor Gratacós as attorney for the Debtor (Docket No. 28). On May 5, 2017, ACEMLA filed its *Motion Requesting Relief of*

*Order*, alleging that the Tito Curet Estate was a competitor of the Debtor, and that granting them access to the license agreements was in detriment of the Debtor's estate. The Debtor argued that the information should remain confidential, as the information is "commercial" and disclosing it could leave the Debtor in a disadvantaged position to renegotiate the terms of the agreements in the future. (Docket No. 34). Therefore, the Debtor requested reconsideration of the Order granting the Tito Curet Estate access to the licensing agreements. On May 11, 2017, the Tite Curet Estate filed its *Opposition to Debtor's Request for Relief from Court's Order*, clarifying that it is not a competitor of ACEMLA or LAMCO and that the purpose of the Tite Curet Estate to review the agreements was to corroborate the Debtor's real income and expenses (Docket No. 35). On May 26, 2017, the court scheduled a hearing for June 27, 2017, to consider the *Debtor's Motion for Reconsideration of Order* and the Tite Curet Estate's *Opposition to Debtor's Motion for Reconsideration* (Docket No. 39).

On May 30, 2017, The Debtor filed: (1) *Application to Employ Accountant Jorge Aquino* (Docket No. 45); (2) *Application to Employ Special Counsel Jelka Duchesne* (Docket No. 46); and (3) *Application to Employ Special Counsel Robert Penchina* (Docket No. 47).

The Debtor filed a *Status Report on Chapter 11 Case* on May 30, 2017 (Docket No. 49). On June 6, 2017, a Status Conference was held (Docket No. 55). On June 26, 2017, the Tite Curet Estate filed its *Motion Requesting the Appearance of Dolores Vera* at the 341 meeting to be held on August 25, 2017 (Docket No. 65).

On June 27, 2017, the court held an evidentiary hearing, to rule upon the *Motion Requesting Reconsideration of Order* granting the Tito Curet Estate access to the license agreements (Docket No. 67). After considering the argument by counsels, the relevant documents filed and the evidence presented by the Debtor, the court granted the request to seal the licensing agreements, but allowed access to the sealed documents to the requesting parties either directly from the case dockets or subject to a confidential agreement, as chosen by the Debtor.

On June 29, 2017, the court authorized the employment of Jorge Aquino as accountant, Jelka L. Duchesne Sanabria as Special Attorney, and Robert Panchina as Special Attorney. (Dockets No. 68, 69 and 70). The Debtor filed its *Motion in Opposition to the Request of Appearance of Dolores Vera* on July 7, 2017, arguing that, pursuant to Local Bankruptcy Rule 4002-1(d), Mrs. Dolores Vera was not the person that could represent the corporation, and that Mr.

Raul Bernard, as President, and Mr. Alan McAbee, as General Manager, were participating during the 341 meeting, and could provide any information the creditors requested. (Docket No. 75). On July 6, 2017, the court denied the Tite Curet Estate's request for the appearance of Mrs. Dolores Vera at the 341 meeting, without prejudice to moving the court for authorization to conduct a Rule 2004 examination (Docket No. 76).

On July 6, 2017, SBS filed a *Motion for Relief form the Automatic Stay* (Docket No. 79). SBS alleged that the stay should be lifted to continue the court proceedings in the United States District Court, Southern District of New York. The Creditor stated that a final judgment had been entered in favor of SBS and against the Debtor, but post- trial matters were still pending, such as a Motion for Attorney's Fees in favor of SBS, pursuant to section 505 of the Copyright Act.

On July 10, 2017, the Debtor filed a *Motion to Supplement Employment of Special Counsel*, stating that Counsel Jelka L. Duchesne Sanabria was to further represent the Debtor in several court litigations (Docket No. 83). Additionally, on July 17, 2017, ACEMLA filed the *Motion in Compliance with Order*, in which it informed the court that the creditors should have access to the license agreements through the case docket and that the documents were going to be redacted, either with the client's names "crossed out" or the total amount of the license "crossed out", "whichever the court decides" (Docket No. 86). The Motion was further supplemented on July 18, 2017, to include a prohibition to download or reproduce the licenses in any form (Docket No. 87).

On July 20, 2017, ACEMLA filed its *Objection in Reply to Motion for Relief from Automatic Stay filed by SBS*, alleging that lifting the stay to allow an affirmative action to collect attorney's fees would substantially harm the bankruptcy estate, that the fees are an unsecured debt, and that SBS could file a Proof of Claim as to the fees in the bankruptcy case in order to be paid through the Reorganization Plan. (Docket No. 88). On July 27, 2017, SBS filed its *Motion for Leave to File Reply and Tendering Reply to Objection in Reply to Motion for Relief of Automatic Stay* (Docket No. 93). SBS stated that "cause" existed for relief from the automatic stay because the copyright infringement action had reached an "advanced stage", and that the District Court was the appropriate forum to determine if attorney's fees should be awarded (Docket No. 93). Additionally, SBS recognized that any effort to collect fees awarded by the District Court would require further authorization from the bankruptcy court. On July 28, 2017, the Debtor filed a *Motion in Compliance with Local Bankruptcy Rule 4001-1*, including supporting documents to be

used on the hearing scheduled for August 1, 2017, related to SBS' request for relief of the automatic stay (Docket No. 97). The Motion was amended through the *Supplement to Motion in Compliance with Local Bankruptcy Rule 4001-1* (Docket No. 98). On July 31, 2017, SBS' *Motion for Leave to File Reply to "Objection in Reply to Motion for Relief From Stay" (Docket No. 88)* was granted by the court (Docket No. 101). On July 31, 2017, SBS and ACEMLA field a *Stipulation Regarding Spanish Broad Casting System Ins.'s Motion for Relief of the Automatic Stay*, delimiting the uncontested facts the parties had agreed upon in anticipation for the hearing scheduled for August 1, 2017 (Docket No. 104).

On July 31, 2017, creditor Roberto Sueiro del Valle filed his *Opposition to Debtor's Motion in Compliance with Order* (Doc. #86), arguing that the court's order providing access to the license agreements of the Debtor did not include any provisions regarding the redaction of the documents, as to the names of the clients or the amounts of the agreements, and that said information is "the key factor to determine the scope of the impact of the licenses over Debtor's estate and overall capacity to concoct a suitable plan in the present proceedings" (Docket No. 105) which was subsequently amended at Docket No. 106.

On August 1, 2017, the court held the hearing on SBS' *Motion for Lift of Stay*. The court concluded that there was cause to lift the stay to allow pending litigation to continue until its final judgment, although collection had to be channeled through the bankruptcy case and, consequently, granting the request for relief (Docket No. 107).

On August 2, 2017, the court granted Roberto Sueiro del Valle's *Opposition to Debtor's Motion in Compliance with Order at Docket #86*. (Docket No. 109). On August 14, 2017, the Debtor file a *Motion to Submit Amended Schedule E/F* and *Motion to Submit Schedule D*, as requested by the Trustee in the 341 meeting held on June 16, 2017 (Dockets Nos. 112 and 113). Additionally, the Debtor filed a *Motion to Submit Amended Statement of Financial Affairs* (Docket No. 124). On August 15, 2017, Creditors Freddie Pérez González, Mercedes Irizarry and Freddie Pérez González & Assoc. PSC filed a *Request for Debtors' Compliance of Court Order* stating that the Debtor had failed to produce/and/or grant access to the licensing agreements and that they deemed it necessary to have access to the information before the 341 meeting to be held on August 25, 2017 (Docket No. 126).

On August 15, 2017, ACEMLA requested *Relief from Order Lifting the Automatic Stay*, stating that in consideration to an appeal pending in the Court of Appeals for the Second Circuit, which could reverse the Judgment of the District Court for the Southern District of New York, the order lifting the automatic stay was premature, and it may force the Debtor "to litigate for a second time the matter of the attorney's fees and thus a prejudice to the bankruptcy estate may result" (Docket No. 128). Additionally, the Debtor filed a *Motion Requesting Relief of Order*, pertaining the court's Order granting the motion filed by creditor Roberto Sueiro on August 2, 2017. The Debtor alleged that ACEMLA intended to inform the amounts of the licenses, however stating that "it is not necessary to disclose the names of the clients in the licenses" and that "crossing the name of the clients does not impede creditors of the scope of the impact of the licenses over the estate and its capacity to make a suitable payment plan" (Docket No. 129).

On August 17, 2017, Banco Popular de Puerto Rico ("BPPR") and Fundación Banco Popular ("Fundación") filed a *Motion for Relief of the Automatic Stay*, stating that an award of attorney's fees was pending in the District Court of Puerto Rico, and requesting partial relief from the automatic stay to provide information in support of the reasonableness of the rates, as requested by the District Court. The Creditors alleged that the request caused no prejudice to the estate as the "relief requested only seeks to have the award of attorney's fees originally granted finally assessed by the District Court" (Docket No. 133).

On August 21, 2017, ACEMLA filed its *Motion to Withdraw Reconsideration at Docket No. 128*, related to the relief of stay granted to SBS, as the Debtor had withdrawn its appeal without prejudice and was participating in a court ordered mediation with SBS as a good faith effort to settle the parties dispute (Docket No. 140). The withdrawal was granted by the court on August 22, 2017 (Docket No. 145).

On August 24, 2017, the Tite Curet Estate filed its *Motion in Opposition to Motion Requesting Relief from Order* (Docket No. 129). The Creditor alleged that allowing the Debtor to produce redacted licenses would "leave all creditors and the Office of the U.S. Trustee blind-folded as to the subjects of the licenses, their understandings and limitations as to providing their copyright's exploitation rights to Debtor, and whether they knew, consented and under what representations about Debtor's transfer of those rights to Ms. Dolores Vera, who holds such catalog to date" (Docket No. 148).

On August 25, 2017, Peer International Corporation of Puerto Rico ("Peer") filed its *Motion for Relief of Stay*, stating that it was the party in a District Court action where LAMCO and ACEMLA, on the one hand, and Peer on the other hand, had competing claims against the musical composition "Llegó la Navidad" and, therefore, requested the court to lift the stay only to allow the action to proceed to a final judgment, but not to collect fees against the Debtor (Docket No. 151).

On August 25, 2017, the Debtor filed its *Motion Requesting Extension of Time (30 days) to File a Small Business Disclosure Statement and Plan of Reorganization* (Docket No. 153), which was granted by the court at Docket No. 155. On August 29, 2017, the court denied the Debtor's *Reconsideration of Order* (Docket No. 129) for the reasons stated in the opposition filed by the Tite Curet Estate (Docket No. 156).

On August 31, 2017, the Debtor filed its *Reply to Relief of Stay Under 362*, alleging that BPPR and Fundación's request was an affirmative action to collect fees from the bankruptcy estate and that attorney's fees are unsecured debt that could be addressed under the reorganization plan without the need to lift the stay (Docket No. 162). On September 12, 2017, a hearing was held regarding the *Motion for Relief of Stay* filed by BPPR and Fundación. Upon the Debtor's consent, the motion was granted, and the stay modified in favor of the Movants up to the entry of order determining the amount of fees, yet channeling collection through the bankruptcy case (Docket No. 175).

On September 19, 2017, the court granted the *Motion to Compel the Debtor to Grant Access to the Licensing Agreements filed by Freddie Pérez Gonzalez (Docket No. 126)* as unopposed (Docket 176).

The hearing on *Motion for Relief of the Automatic Stay* filed by Peer (Docket No. 151) was held on November 7, 2017, and upon the Debtor's consent, the motion was granted and the stay was lifted allowing Peer to pursue action up to final judgment although collection needed to be channeled through the bankruptcy process (Docket No. 196). On November 9, 2017, ACEMLA filed an additional E*xtension of Time to File a Small Business Disclosure Statement and a Plan of Reorganization* (Docket No. 193), granted by the court on November 17, 2017 (Docket No. 199). ACEMLA requested an additional extension on December 1, 2017 (Docket No. 241), which was granted on February 5, 2017 (Docket No. 243). The Debtor requested an *Extension of Time to File*

*Licenses* on November 16, 2017 (Docket No. 198) which was granted by the court on November 17, 2017 (Docket No. 201). Furthermore, on November 11, 2017, the Debtor filed its *Motion for Authorization to Assume Executory Contracts Under Section 6002(a)(3)*, to assume all executory contracts in one motion "to alleviate the burden and the unnecessary filing of eighty-four (84) motions but in compliance with the principle of judicial economy" (Docket No. 213).

On November 27, 2017, the Debtor filed the following objection to claims: (a) *Objection to Claim Number 11 by Claimant Broadcast Music Inc.* (Docket No. 223); (b) *Objection to Claim Number 2 by Claimant Freddie Pérez* (Docket No. 224); (c) *Objection to Claim Number 6 by Claimant Hector O. Ramos* (Docket No. 225); *Objection to Claim Number 4 by Claimant Banco Popular de Puerto Rico* (Docket No. 226); (d) *Objection to Claim Number 5 by Claimant Media Power Group Inc.* (Docket No. 227); (e) *Objection to Claim Number 3 by Claimant Peer International Corp.* (Docket No. 228); and (f) *Objection to Claim Number 3, by Claimant Roberto Sueiro del Valle* (Docket No. 229). On November 28, 2017, ACEMLA filed an *Amended Objection to Claim 2 by Claimant Freddie Pérez Gonzalez & Assoc.*, P.S.C. (Docket No. 230) and an *Amended Objection to Claim Number 4 by Claimant Banco Popular de Puerto Rico* (Docket No. 231). The Debtor additionally filed an *Objection to Claim Number 10 by Claimant Spanish Broadcasting System, Inc.* on December 6, 2017 (Docket No. 244).

On December 12, 2017, the court granted the Debtor's *Motion Requesting Authorization to Assume Executory Contracts under Section 6006(e)(3)* as unopposed (Docket No. 249). On December 13, 2017, Freddie Pérez & Assoc. P.S.C. filed the *Opposition to Amended Objection to Claim No. 2-1* (Docket No. 250). Furthermore, Banco Popular de Puerto Rico filed its *Answer to Objection to Claim 4* on December 15, 2017 (Docket No. 252). The court denied the Debtor's *Objection to Claim No. 4 filed by Banco Popular de Puerto Rico*, considering it to be premature and for the reason stated in the opposition filed by BPPR (Docket No. 255).

On December 19, 2017, the Tite Curet Estate filed its *Motion Restating Request for Debtor to File Licensing Agreements* (Docket No. 254).

As to the *Objection to Claim 2-1 by Claimant Freddie Pérez & Assoc. P.S.C.,* and its *Opposition*, the court scheduled a Pre-trial Conference (Docket No. 256). On December 20, 1017, Freddie Pérez & Assoc. P.S.C. filed a *Motion Joining "Motion Restating Request for Debtor to File Licensing Agreements"* (Docket No. 260). Peer International Corporation of Puerto Rico filed

its *Answer to Objection to Claim #9* on December 22, 2017 (Docket No. 263). The Motion filed by the Tite Curet Estate requesting the Debtor to file the licensing agreements was granted on December 22, 2017 (Docket No. 264). On that same date, the Court ordered the Debtor to show cause why the case should not be dismissed for failure to file a Disclosure Statement and Plan (Docket No. 265). The Motion filed by Freddie Pérez &Assoc. P.S.C., requesting the Debtor to file the licensing agreements was granted by the court on December 22, 2017 (Docket No. 266).

On December 23, 2017, the Debtor filed *Amended Schedules A/B*, to correct information related to a settlement in District Court case 13-cv-01526-RJS against Spanish Broadcasting System (Docket No. 267). On that same date, ACEMLA filed the *Chapter 11 Small Business Disclosure Statement* and the *Chapter 11 Small Business Plan* (Dockets Nos. 270 and 271). On December 27, 2017, Creditor Freddie Pérez Gonzalez & Assoc. P.S.C. filed its *Motion for Reconsideration and/or Vacate "Order Setting Pre-Trial Conference" (DCKT.256),* requesting the court to reconsider and vacate the court's Order issued on December 19, 2017, considering that the Motions related to the Order (Dockets Nos. 230 and 250) could be addressed by the court with the assertions contained in said motions as well as with the documents previously filed without the need to celebrate a pretrial conference (Docket No. 275). On December 27, 2017, the court denied the Debtor's *Objection to Peer International Corporation Corp. Claim No. 9*, adopting the reasons stated in Peer's opposition (Docket No. 276). On that same date, the court entered its *Order Conditionally Approving Disclosure Statement, Fixing Time for Filing Acceptances or Rejections of the Plan, Combined with Notice Thereof and of the Hearing on Confirmation of the Plan* (Docket No. 277).

On December 28, 2017, ACEMLA filed its *Motion for Entry of an Order Authorizing the Filing of License Agreements Under Seal* (Docket No. 278). The court granted Debtor's request to file license agreements under seal (Docket No. 279). On December 29, 2017, the Debtor filed sealed *Omnibus Motion to Assume License Contract Agreements* (Docket No. 280).

The court granted the Motion filed by Freddie Pérez Gonzalez & Assoc. requesting reconsideration and/or to vacate order setting pretrial conference at Docket No. 256 (Docket No. 287). Additionally, the Debtor's *Amended Objection to Claim #2 filed by Freddie Pérez & Assoc.* was denied by the court on January 5, 2018 (Docket No. 288). On that same date, the court scheduled a hearing for January 30, 2018, to address the *Debtor's Objection to Claim #6 filed by*

*Hector O. Ramos at Docket No. 225*; *Debtor's Objection to Claim #5 filed by Media Power Group Inc. at Docket No. 227*; and *Debtor's Objection to Claim #3 filed by Roberto Sueiro del Valle at Docket No. 229* (Docket 292).

On January 9, 2018, the Tite Curet Estate filed its *Motion Restating Request for Debtor to File Licensing Agreements in Compliance with Court Order at Docket No. 67* (Docket No. 305). The Creditor alleged that the Omnibus Motion to Assume License Contract Agreements filed by the Debtor on December 29, 2017 at Docket No. 280 was incomplete, as it just included a list of license agreements and some of the alleged terms, failing to comply with the Order issued by the court on June 27, 2017, at Docket No. 67, which required the Debtor to include the license agreements.

On January 10, 2018, the Debtor filed its *Ballot for Accepting or Rejecting ACEMLA de Puerto Rico Inc. Plan of Reorganization, Dated December 23, 2017* (Docket No. 306). On January 16, 2018, the Debtor filed its *Objection to Claim 1 by Claimant Curet Pamias* (Docket No. 311). The court granted the Tite Curet Estate's *Request for Entry of Order to File Licensing Agreements in Compliance With the Court's Order at Docket No. 67* on January 16, 2018 (Docket No. 312). The court ordered the Debtor to comply within fourteen (14) days or to show cause why the case shouldn't be dismissed.

The Tite Curet Estate filed its *Opposition to Objection to Claim filed by Curet Pamias* on January 18, 2018 (Docket No. 313). Furthermore, SBS filed its *Answer to Objection to Claim 10* (Docket No. 314). On that same date, the Debtor filed its *Motion for Reconsideration of Order*, regarding the court's Order granting Peer's answer to Objection to Claim Number 9 at Docket No. 263 (Docket No. 315). The Debtor alleged that Peer had no secured interest over the property of ACEMLA, and that Peer had no "right to payment" for attorney's fees, as there was no final judgment in the civil action case. On January 19, 2018, the court denied the Debtor's *Objection to Claim #10 of Claimant Spanish Broadcasting System, Inc*. (Docket No. 319). Broadcasting Music Inc. ("BMI") filed its *Response to Objection to Claim 11-1* on January 23, 2018 (Docket No. 326).

On January 25, 2018, ACEMLA filed its *Motion in Compliance with Order to Show Cause and Requesting Entry of Order*, regarding the court's Order at Docket No. 312, where the court ordered the Debtor to submit the licensing agreements (Docket No. 327). The Debtor reargued that providing the licensing agreements would be in detriment of the Debtor's business considering

that filing the information in a sealed docket allowed the creditors "to copy, print, download or disclose to third parties". The Debtor requested the court an Order, allowing the creditors to see the licenses in Court with the deputy clerk, but not to have access from any personal computer through the pacer electronic system. The Debtor also requested the court to change the hearing scheduled for January 30, 2018, for final approval of the disclosure statement and for confirmation of the plan to a status hearing. On that same date, the Debtor filed its *Motion for Continuance of the Approval of the Disclosure Statement and Reorganization Plan Hearing*, alleging that an agreement with secured creditor Sucesión Villamil had not finalized and that the financial projections needed to be supplemented (Docket No. 328). The Debtor clarified that the extension requested included the time to cast the corresponding vote on the approval of the disclosure statement and the plan and that the Debtor had shown cause to request an extension of time of the three hundred (300) days in accordance to section 1121(e) and 1129(e). On January 25, 2018, SBS and BMI filed a *Response to Motion for Continuance and Request for Extension of Time to File Objection to Approval of Disclosure Statements and Plan* (Docket No. 331). The Creditors stated that the Debtor failed to submit any evidence supporting the conclusion that they will be able to confirm a plan in a reasonable amount of time and that, therefore, the extension of the three hundred (300) days period under sections 1121(e) and 1129(e) should be denied.

The court denied the Debtor's *Objection to Claim #11 filed by Broadcast Music, Inc*. at docket no. 223 on January 26, 2018 (Docket No. 336). Furthermore, on January 26, 2018, BPPR filed its *Objection to Debtor's Proposed Disclosure Statements and Plans of Reorganization* arguing that: (a) the Disclosure Statements failed to contain adequate information bearing on the success of the proposals in the Plans of Reorganization, as required by section 1125; (b) the Disclosure Statement nor the plan of reorganization provided for BPPR as a member of the class of unsecured creditors; (c) the Disclosure Statements failed to identify the source of income to fund the Plans of Reorganization, other than stating that the plan "will be funded with cash available proceeds from the revenue that the Debtors generate from licensing, after paying operating expenses and taxes" and, therefore, failing to state feasibility (Docket No. 337). On that same date, Peer filed its motion titled *Joinder of Peer International Corporation of Puerto Rico in Response of Spanish Broadcasting System, Inc. to Debtors' Motion for Continuance* (Docket No. 338).

On January 26, 2018, the Tite Curet Estate filed its *Motion Objecting to Motion in Compliance with Order to Show Cause and Requesting Entry of Order (Dk. No. 327) and Restating Request for Dismissal and Sanctions* (Docket No. 339). The Creditor alleged that the Debtor's Motion was an attempt to avoid filing the licenses as ordered by the court, that nine (9) months had passed since the court's Order and the Debtor, however, had intentionally not complied, in detriment of Creditors. The Creditor requested the dismissal of the case, as the Debtor had failed to show cause as ordered by the court.

Creditor Freddie Pérez Gonzalez, Mercedes Irizarry Ferrer and Freddie Pérez Gonzalez & Assoc. PSC filed a *Joinder to Response (Dckts. 331 & 227) to Debtors' Motions for Continuance (Dckts. 328 & 225) and to Objection (Dckts. 337 & 235) to Debtors' proposed Disclosure Statements and Plans of Reorganization (Dckts. 269, 270 & 192, 193)* (Docket No. 340).

On January 26, 2018, Peer filed its Motion titled *Peer International Corporation of Puerto Rico's Objection to (1) Final Approval of the Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing the Reorganization Chapter 11 Plan Proposed by Debtor and (II) Confirmation of the ACEMLA de Puerto Rico, Inc. Plan of Reorganization* (Docket No. 341). The creditor alleged that the Proposed Disclosure Statement: (a) failed to disclose adequately material facts, such as information that would permit an evaluation of the Debtor's future viability; (b) did not meet the best interest test as it is based on a flawed liquidation analysis that does not shows how Confirmation will be in the best interest of Creditors; (c) contained material omissions about the litigations to which the Debtor is currently a party and the consequences of an adverse judgment against the Debtor in any of those litigations; (d) failed to provide any evidence that the Debtor had reviewed or considered potential avoidance actions or other claims that it intends to release through the Proposed Plan; and (e) failed to explain how the Debtor's equity would be treated under the proposed plan. The Creditor further alleged that when a chapter 11 plan is so deficient that it cannot be confirmed, as in the present case, the court should refuse to approve a disclosure statement based on that plan. Additionally, the Creditor stated that the plan could not be confirmed because it failed to meet at least five of the requirements of section 1129(a), including failure to provide adequate disclosure, failure to file the Proposed Plan in good faith, failure to disclose post-confirmation directors and officers, and failure to demonstrate that the plan is feasible.

-12-

On January 26, 2018, Creditor Freddie Pérez González, Mercedes Irizarry Ferrer and Freddie Gnzaléz & Assoc. PSC filed a *Joinder to Motion Objecting (Dockets. 339) "Motion in Compliance…" (Dckt. 327)* (Docket No. 343). The Creditor joined the Tite Curet Estate in its request for dismissal for failure to comply with the court's Order to the Debtor to disclose the licensing agreements.

On the same date, SBS and BMI filed a *Joint Objection of Spanish Broadcasting System, Inc. and Broadcast Music, Inc. to Final Approval of Disclosure Statement and Confirmation of Plan* (Docket No. 344). SBS and BMI alleged that the Disclosure Statements do not contain adequate information on any of the following topics: (i) the Debtor's current financial status, including description of assets and income and proper valuation; (ii) anticipated post-confirmation financial positions and prospects, including forecasts and projections; (iii) status and amounts of legal claims in which the Debtor is a party; (iv) list of unsecured creditors and amount of their claims; (v) potential administrative and priority claims of SBS and BMI; (vi) insider contributions to the Debtors, receiving secured creditors treatment; (vii) monthly operating reports for November and December 2017; (viii) background and credentials for the post-confirmation management of the Debtors; and (ix) the risk factors identified by the Debtor. The parties alleged that the Disclosure Statements did not provide sufficient information as to feasibility, other than vague assertions that the Debtor will continue to have income from their unspecified licensing agreements, sufficient to meet the requirements of the plan. Furthermore, SBS and BMI alleged that the proposed plan failed to meet the feasibility test pursuant to section 1129(a)(11), as the financial information available in the Disclosure Statement reflects a negative cash flow and the plan presumes that the Debtor will have a positive net income. Additionally, the parties stated that the liquidation analysis presented by the Debtor failed to consider liens on ACEMLA's properties, the value of the Debtor's assignments and the liquidation value of the assets, and therefore, failed to meet the "best interest of the creditors" test. Finally, the Parties alleged that the plan improperly classified Debtor's Insiders as impaired creditors to vote on the plan; the Debtor failed to include provisions regarding SBS's and BMI's claims; the plan failed to meet the requirements of Section 1129(a)(5)(A) by failing to disclose the identity and affiliations of any individual proposed to serve, after the confirmation of the plan, as a director or officer; the plan failed to meet the good faith requirement of section 1129(a)(3); and the plan violated the absolute priority rule, as the plan

provided for payments to Class II creditors Luis Raul Bernard and Dolores Vera Vargas, as well as providing for salaries to the equity security holders, when unsecured creditors are supposedly going to receive 50% of their claims.

On January 29, 2018, the court granted BMI's *Response to Motion for Continuance and Request for Extension of Time to File Objections to Approval of Disclosure Statement and Plan* (Docket No. 346). On the same date and regarding the court's Order at docket no. 346, ACEMLA filed its *Motion Requesting Relief from Order*, alleging that: (a) the Debtor is still in negotiations with its Creditors due to the complexity of the case; (b) the filing of a Disclosure Statement and a Plan of Reorganization is *prima facie* evidence that the plan can be approved as it was filed in accordance with the Bankruptcy Code and will be supported by the financial information that the accountant will be filing and; (c) the court may use a more lenient standard to find "cause" to grant an extension of the forty five [45] day period since there is no detrimental impact upon the creditor's bargaining position occurring where no plan has been filed (Docket No 351).

On January 30, 2018, the court held a hearing to address the Final Approval of the Disclosure Statement and the Confirmation of the Small Business Plan (Docket No. 352). The court had also scheduled for the hearing the following matters: (a) Debtor's Objection to Claim #6 filed by Hector O. Ramos (Docket No. 225); (b) Debtor's Objection to Claim #5 filed by Media Power Group, Inc. (Docket No. 227); and (c) Debtor's Objection to Claim #3 filed by Roberto Suiero del Valle (Docket No. 229). During the hearing, the court denied the Final Approval of the Disclosure Statement (Docket No. 268) upon the Debtor's admittance that it could not be approved and that the plan could not be confirmed. Furthermore, the court denied the Debtor's request for extension of time to file the Disclosure Statement for failure to comply with the requirements of section 1121(e).

On February 1, 2018, Peer filed its *Opposition to Motion for Reconsideration of Order* filed by the Debtor at Docket No. 315 and related to the court's Order granting Peer's *Reply to Objection to Claim #9* (Docket No. 356). Peer alleged that the Debtor had failed to demonstrate that cause for reconsideration existed and that the equities of the case did not support disallowance of the claim. The *Motion for Reconsideration* filed by the Debtor was denied by the court on February 8, 2018 (Docket No. 359).

On February 1, 2018, the Debtor filed its *Sealed Motion Filing Licensing Agreements* (Docket No. 357). On February 6, 2018, the court denied ACEMLA's request for *Reconsideration of Order* at Docket No. 346 granting BMI's *Response to Motion for Continuance and Request for Extension of Time* (Docket No. 358).

On February 9, 2018, ACEMLA filed a *Motion Requesting Extension of Time to Confirm the Plan* (Docket No. 363). On February 10, 2018, the Debtor filed its *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing the Reorganization Chapter 11 Plan Proposed by Debtor* (Docket No. 364) and *ACEMLA de Puerto Rico, Inc. Plan of Reorganization* (Docket No. 365). On February 12, 2018, the court granted the Debtor's *Request for Extension of Time to Confirm a Plan* (Docket No. 367). Furthermore, on February 15, 2018, the court entered its *Order Conditionally Approving Disclosure Statement, Fixing Time for Filing Acceptances or Rejections of the Plan, and Fixing the Time for Filing Objections to the Disclosure Statement and the Confirmation of the Plan, Combined with Notice thereof and of the Hearing on Confirmation of the Plan* (Docket No. 369). On February 15, 2018, the Debtor filed *the Ballot for Accepting or Rejecting ACEMLA de Puerto Rico, Inc. Plan of Reorganization,* dated February 9, 2018 (Docket No. 370).

On February 20, 2018, the court denied the Debtor's *Objection to Claim #1 filed by Curet Pamias* at Docket No. 311 (Docket No. 374). On February 22, 2018, the Tite Curet Estate filed its *Motion Requesting Access to Sealed Motion at Do. No. 357* (Docket No. 375), which was granted by the court on February 23, 2018 (Docket No. 378).

SBS filed its *Spanish Broadcasting System Inc.'s Motion for Allowance of Administrative Expense Payment* on March 1, 2018 (Docket No. 380). SBS argued that under the "fundamental fairness" exception, the Creditor is entitled to the attorneys' fees related to the District Court proceedings, considering that the Debtor chose to proceed to a bench trial after filing the bankruptcy petition, that the Creditor was injured by the Debtor's actions and that, therefore, the fees requested by SBS in the District Court should receive an administrative priority status.

On March 8, 2018, ACEMLA and Creditor Sucesión Villamil filed a *Stipulation and Settlement Agreement By and Between Debtor and Sucesión Villamil* (Docket No. 382). Furthermore, on March 9, 2018, the Debtor filed its *Reply and Opposition to Spanish Broadcasting System, Inc. Motion Requesting Allowance of Administrative Expenses* (Docket No. 383).

-15-

ACEMLA argued that the SBS' interpretation of the fundamental fairness exception is unwarranted, considering that the rule's intent is to remedy an actual, necessary cost and expense of preserving the estate and that the allowance of administrative expenses should be narrowly construed. On that same date, BMI filed its *Broadcast Music Inc.'s Motion for Allowance of Administrative Expense Payment* (Docket No. 384). BMI argued, as previously argued by SBS, that its attorneys' fees claim was entitled to administrative priority status under the "fundamental fairness" exception. Additionally, the Creditor filed the *Broadcast Music Inc.'s Motion to Shorten Time to Respond to "Motion for Allowance of Administrative Expense Payment",* requesting to shorten the time period to reply to BMI's Motion, considering that the determination as to the treatment of the claims impinges on the confirmability of Debtors' Chapter 11 Plan (Docket No. 385).

On March 12, 2018, Banco Popular de Puerto Rico filed its *Ballot for Accepting or Rejecting ACEMLA de Puerto Rico Inc. Plan of Reorganization, Dated February 9, 2018*, rejecting the Debtor's proposed plan (Docket 386).

The Debtor Filed a *Reply and Opposition to Broadcast Music, Inc. Motion Requesting Allowance of Administrative Expense Payment* on March 12, 2018, alleging that BMI's interpretation of fundamental fairness exception was unwarranted, considering that the rule's intent is to remedy an actual, necessary cost and expense of preserving the estate and that the allowance of administrative expenses should be narrowly construed (Docket No. 387).

On March 13, 2018, the Debtor filed a Motion Requesting Extention of Time to File Statement Pursuant to §1129 (Docket No. 388) which was granted by the Court on March 15, 2018 (Docket No. 390). On the same date, Secured Insider Creditor Luis Raul Bernard Guzman filed a *Reply and Opposition to Spanish Broadcasting System Inc.'s and Broadcast Music's Motion for Allowance of Allowance of Administrative Expense Payment* (Docket No. 391), joining the Debtor's Reply and Opposition to the Creditors' request. Furthermore, Mr. Bernard argued that the contingent claims of BMI and SBS arose prior to the commencement of the case and that the contingent claim did not rise from Debtor's post-petition conduct but from a prepetition filing of a Complaint, and, therefore, any fees should be treated as an unsecured nonpriority claim.

On March 16, 2018, Creditor Media Power Group Inc. filed its *Ballot for Accepting or Rejecting ACEMLA de Puerto Rico Inc. Plan of Reorganization* (Docket No. 393), rejecting the

proposed plan. On the same date, the Tite Curet Estate filed its *Ballot Accepting or Rejecting ACEMLA de Puerto Rico, Inc. Plan of Reorganization, Dated February 9, 2018*, rejecting the plan (Docket No. 394).

Furthermore, Peer filed its *Peer International Corporation of Puerto Rico's Objection to (I) Final Approval of the Disclosure Statements Pursuant to Section 1125 of the Bankruptcy Code Describing the Reorganization Chapter 11 Plan Proposed by the Debtors and (II) Confirmation of the ACEMLA de Puerto Rico and Latin American Music Company, Inc. Plan of Reorganization* (Docket No. 395) on March 16, 2018. Peer stated that the Debtors' proposed plans violate the letter and the spirit of the Bankruptcy Code and are unconfirmable. The Creditor alleged that the projections included in the plan are "half-baked, not based in reality and do not provide any basis for a finding that the Proposed Plans are feasible." Moreover, the Creditor argued that "the ACEMLA Proposed Plan appears to estimate Peer's claim against ACEMLA without adequate due process while the LAMCO Proposed Plan fails to provide treatment to Peer's claim at all, claiming that it is a duplicative of the claim Peer filed against ACEMLA. The Proposed Plan also revest unknown property in the Debtors. In addition, the Proposed Plan fail to identify the Debtors' proposed officers and directors and their compensation. The Proposed Plans also violate the absolute priority rule by permitting the Debtors' equity to retain ownership." The Creditor further alleges that the plan is not proposed in good faith.

Peer additionally stated that the Proposed Disclosure Statements fall short of containing the adequate information required under section 1125 of the Bankruptcy Code, by: (a) not adequately addressing the litigations to which the Debtors are a party or the consequences of an adverse judgment against the Debtors in any of those litigations; (b) not providing any realistic information to enable a creditor to evaluate the feasibility of the Proposed Plans; (c) the liquidation analysis submitted as part of the Proposed Disclosure Statements is based on stale information and is not credible; (d) no discussion is included regarding potential avoidance actions and other claims, which could be pursued in a Chapter 7 scenario, or their value; and (e) the Disclosure doesn't explain why the Debtors' equity holders will retain their equity interests despite far less than payments in full to creditors.

On the same date, Peer filed its *Peer International Corporation of Puerto Rico's Motion for an Order Converting Cases to Chapter 7 Pursuant to Section 1112(B) of the Bankruptcy Code*

(Docket No. 396). The Creditor stated that the egregious deficiencies with the plan are not deficiencies that can be cured, that the Debtors do not have enough cash to pay their administrative expenses and other payments that would need to be paid upon plan confirmation and that conversion of the case is in the best interest of the creditors.

SBS also filed a *Motion to Convert Case to Chapter 7* on March 16, 2018 (Docket No. 400). SBS alleged that there is cause to convert the case, pursuant to 11 U.S.C. §1112(b)(4)(B), as the Debtors have grossly mismanaged the Estates by repeatedly pursuing baseless copyright lawsuits, which have routinely resulted in judicial admonishment and attorneys' fees awards against them. The Creditor further alleged that the transfer to Ms. Dolores Vera Vargas, who is an insider, of the copyright interests in order to become judgment proof and to shield assets from creditors constitute cause to convert to Chapter 7. Furthermore, SBS stated that the Proposed Disclosure Statement and the Proposed Plans were filed after the expiration of the 300-day term established by section 1121(a). SBS additionally filed its *Spanish Broadcasting Systems, Inc.'s Motion to Shorten Time to Respond to "Motion to Convert Case to Chapter 7"* (Docket No. 402) which was granted by the court on March 19, 2018 (Docket No. 411). Moreover, SBS and BMI filed its *Joint Objection of Spanish Broadcasting System, Inc. and Broadcast Music Inc. to Final Approval of Disclosure Statement and Confirmation of Plan* (Docket No. 403). The Joint Creditors stated that the Proposed Disclosure Statement "fails to provide meaningful or informative discussion of (i) insider contributions to the Debtors, receiving secured creditor treatment; (ii) background and credentials of the Debtors' post-confirmation manager, Mr. Frederic Alan McAbee; (iii) potential administrative and priority claims; and (iv) the risks factors identified by Debtors". The Joint Creditors further stated that the plans are unfeasible because the Debtors lack sufficient cash flow to fund them and that the plans fail to comply with section 1129, and the absolute priority rule under section 1129(a)(5), as equity holders retain their interests, and is not proposed in good faith as required by section 1129(a)(3).

On March 16, 2018, SBS and BMI filed, respectively, a *Ballot for Accepting or Rejecting ACEMLA de Puerto Rico Inc. Plan of Reorganization, Dated February 9, 2018*, rejecting the plan (Dockets Nos. 404 and 405).

On March 19, 2018, the Debtor filed a *Statement Pursuant to 11 U.S.C. §1129(b) Cram Down* holding that the plan presented is fair and equitable (Docket No. 412). The Debtor argued

-18-

that the proposed plan provides for a 25% distribution to unsecured creditors although the liquidation analysis scenario would represent a 1% distribution, and that the plan provides to pay priority creditors in full within five (5) years. On the same date, the Debtor filed its *Opposition to Motion to Convert Case to Chapter 7 filed by Spanish Broadcasting System, Inc. and Peer International Corporation of Puerto Rico* (Docket No. 413). Furthermore, ACEMLA filed its *Motion in Reply to Objections Filed by Spanish Broadcasting System, Inc. and Broadcasting Music Inc. and Peer International Corporation of Puerto Rico to Final Approval of Disclosure Statement and Confirmation of Plan* (Docket No. 414).

During March 20, 2018, and continued to March 22, 2018, the court held the hearing for final approval of the Proposed Disclosure Statement and Proposed Plan (Dockets Nos. 415, 424 and 423). On March 21, 2018, Creditor Freddie Pérez González, Mercedes Irizarry Ferrer and Freddie Pérez González & Assoc. PSC filed its *Informative Motion on Debtor's 11 U.S.C. 1129(b) Statement (DCKT. 412)* asserting that the Debtor had not included its vote and that it had requested the Debtor to amend the statement to include it (Docket No. 416).

On April 3, 2018, BPPR filed its *Motion to Inform Amounts in Attorney's Fees Granted to Banco Popular de Puerto Rico and Fundaci[o]n included in Proof of Claim #4,* informing that the District Court for the District Court of Puerto Rico had entered judgment dismissing the Debtor's alleged copyright infringement complaint against BPPR and Fundación and granted the creditors $184,246.75 in attorney's fees and costs, which were reaffirmed by the Court in Reconsideration (Docket No. 427). BPPR and Fundación requested the court to validate the amounts included in the Proof of Claim #4, pursuant to the district court's determination. The court granted BPPR and Fundación's request on April 2, 2018 (Docket No. 428).

On April 3, 2018, SBS and BMI filed *its Joint Motion of Spanish Broadcasting System Inc. and Broadcast Music Inc. to Supplement the Motion for Allowance of Administrative Expenses* (Docket No. 430).

The court approved the stipulation and settlement agreement filed by the Debtor and Sucesion Villamil on April 9, 2018 (Docket No. 432). On April 12, 2018, the Debtor filed its *Motion in Compliance with Order and Requesting Confirmation of the Chapter 11 Plan as Beneficial for Creditor and Opposition to Motion Requesting Conversion to Chapter 7* (Docket No. 435). The Debtor alleged that it complied with all the requirements in section 1129 of the

Bankruptcy Code although the Plan did not receive the required votes from the creditors to be confirmed and, therefore, it is entitled to request the confirmation of the plan pursuant to section 1129(b). The Debtor further alleged that the Disclosure Statement contained adequate information for creditors to make an informed decision. Aditionally, the Debtor argued that the case should not be converted to a Chapter 7, as it is not in the best interest of its creditors.

On April 12, 2018, Peer, SBS and BMI filed its *Motion submitting document(s): Proposed Findings of Fact and Conclusions of Law of Peer International Corporation of Puerto Rico, Spanish Broadcasting System, Inc. and Broadcast Music, Inc. (I) Denying Final Approval of the Debtors Proposed Disclosure Statements, (II) Denying Confirmation of the Debtors Proposed Chapter 11 Plans and (III) Converting the Debtors Cases to Cases Under Chapter 7 of the Bankruptcy Code* (Docket No. 437).

Furthermore, the Tite Curet Estate filed its *Motion in Compliance with Court Order, Joining in Part Peer International Corporation of Puerto Rico, Spanish Broadcasting System, Inc. and Broadcast Music Inc, Inc.'s Motion at Docket 437 and Requesting Dismissal and Bar to Re-file for a Period of at Least Two Years* on April 12, 2018 (Docket No. 438). On April 18, 2018, Peer, SBS and BMI filed a Motion for Leave to File *Reply of Peer International Corporation of Puerto Rico and Spanish Broadcasting System, Inc. to Request of Estate of Catalin[o] Curet-Alonso for Dismissal of Cases at Docket No. 438* (Docket No. 441), to which the Debtor opposed on May 7, 2018 (Docket No. 442).

On November 16, 2018, SBS filed a *Motion Requesting Entry of Order for Permission to Access Sealed Documents*, alleging that access to the documents will allow the Creditor to confirm the accuracy of Debtor's monthly operating reports, and to evaluate the continued viability of the Debtor's Plan of Reorganization (Docket No. 460). ACEMLA opposed to SBS request on November 21, 2018, stating that: (1) the Creditor is not entitled to access the sealed documents because it was not one of the parties who initially requested the access to the court; (2) the Creditor is a competitor and granting access will cause an unfair advantage to the Debtor; (3) the inspection of the sealed licenses is inconsequential to determine feasibility of the plan and (4) the documents that support the operating reports are attached to each report (Docket No. 462). On December 4, 2018, SBS filed its *Reply of Spanish Broadcasting Systems, Inc. in Support of Motion for Permission to Access Sealed Documents* restating that it should had access to the documents as the

information is critical to evaluate the Debtor's representations in the monthly operating reports regarding the sources and amounts of its revenues (Docket No. 464). On November 30, 2018, SBS filed its *Motion for Leave to File Reply to Debtor's Opposition at Docket No. 462* (Docket No. 463). The Debtor filed the *Debtor's Motion to Strike Reply* [Docket No. 464] on December 10, 2018, as leave of the court was not obtained to file a Reply (Docket No. 466). On December 24, 2018, SBS filed the *Spanish Broadcasting System's Inc.'s Opposition to Debtor's Motion to Strike Reply* stating that the Motion was filed after the proposed deadline, in an abundance of caution, and absent a ruling of the court to the *Motion for Leave to File a Reply* (Docket No. 469).

Discussion

a. *A Party in Interest May Object the Final Approval of the Disclosure Statement and Chapter 11 Plan*

11 USC §1109 states that "[a] party in interest, including the debtor, the trustee, a creditor's committee, and equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and appear and be heard on any issue in a case under this chapter."

The term "creditor" includes an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor. 11 U.S.C.S. § 101(10)(A). A "claim" is defined, in part, as a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. 11 U.S.C. §101(5)(A) Furthermore, the categories on which a party may be heard under Section 1109 are non-exhaustive. In Re Teligent, Inc., 640 F.3d 53, 54 (2nd Cir. 2011). "The general theory behind the section is that anyone holding a direct financial stake in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." In Re Teligent at 54 *citing* Alan Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1109.01 (16th ed. 2011). The term is generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings. In Re Hutchinson, 5 F.3d 750, 756 (4th Cir. 1993). As the term "party in interest" under 11 U.S.C.S § 1128(b) includes creditors, it includes parties holding contingent, unliquidated, or disputed claims.

-21-

Creditors that hold contingent claims are parties in interest, as enumerated by §1109, and, therefore, entitled to object the Proposed Disclosure Statement and chapter 11 plan, pursuant to section 1128(b).

### b. *11 USC §1125 Disclosure Statement Requirements*

"A mayor concern of Congress in enacting the present Chapter 11 was the creation of an appropriate mechanism for providing all parties in interest with adequate information about the debtor and the proposed plan. Thus, prior to the circulation of a plan and solicitation of votes on the plan by creditors and equity security holders, they must receive adequate information to make an informed judgment on the plan in the form of a court-approved disclosure statement." 2 Bankruptcy Law Manual §11:59, p. 899 (5th ed. 2017).

"The issue of defective disclosure in reorganization cases arises within the framework of chapter 11, which has provisions setting minimum standards for plans (11 U.S.C. §1123), requiring disclosure of adequate information to those entitled to accept or reject the plan (11. U.S.C. §1125) [and] requiring that the plan proponent prove at the confirmation hearing that it has complied with those requirements (11 U.S.C. §1129(a)(2))…" Official Committee of Unsecured Creditors v. Michelson (In Re Michelson), 141 B.R. 715, 718 (Bankr. E.D. Cal. 1992).

11 U.S.C.S. § 1125(a)(1) defines adequate information as: "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interest in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information."

"Both bankruptcy courts and creditors rely on a debtor's disclosure statement in determining whether to vote for or approve a proposed plan of reorganization." In re Constr. Supervision Servs., Inc., 2012 Bankr. LEXIS 4564, *1, 2012 WL 4681414, *citing* In Re RADCO

Props., Inc., 402 B.R. 666, 682 (Bankr. E.D.N.C. March 9, 2009), *see also* In Re A.H. Robins Co., 216 B.R. 175, 180 (E.D. Va. 1997). "Creditors rely on the disclosure statement to determine what distribution or other assets they will receive and also what risks they will face. Accordingly, the importance of full and honest disclosure is critical and cannot be overstated." *Id.*

"The phrase "adequate information" has been deliberately left vague by Congress to give a bankruptcy court "wide discretion to determine on a case by case basis" whether the disclosure is reasonable." In Re Ferretti, 128 B.R. 16, 18 (Bank. D. N.H. 1991). "A disclosure statement should provide the creditors with an accurate basis for determining their position and their ability to make an informed decision with regard to the acceptance or rejection of the plan." In re Constr. Supervision Servs., Inc., *Supra,* at *5. A proper disclosure statement should be clear and succinct. In re RADCO Props., Inc., 402 B.R. at 669.

"Disclosure statements are required to contain liquidation analyses that enable creditors to make their own judgment as to whether a plan is in their best interests and to vote and object to a plan if they so desire. The protections of creditors at confirmation and during the confirmation process are exceptionally strong." In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 282 (Bankr. E.D.N.C. 2009).

"…[L]abeling a document "disclosure statement" does not ensure that it contains the information required by Bankruptcy Code Section 1125. The adequacy of the information set forth in a disclosure statement is a subjective determination, and one that is committed to the court's sound discretion." In Re Babayoff, 445 B.R. 64, 78 (Bankr. E.D. N.Y. 2011).

Although the Debtor alleges that the Proposed Disclosure Statement is adequate, the contingent creditors strongly challenge its adequacy, deeming the Debtor's chapter 11 plan unconfirmable. The court held a hearing for final approval of the Proposed Disclosure Statement and heard the parties' arguments.

   c. *The Hearing for Final Approval of the Disclosure Statement and Confirmation of Chapter 11 Plan*

The hearing for final approval of the Proposed Disclosure Statement and Proposed Plan was held on March 20, 2018, and continued to March 22, 2018 (Dockets Nos.415 and 423).

-23-

The first witness presented by the Debtor was Mr. Jorge Aquino Barreto, CPA. Mr. Aquino declared that he worked on the projections for the disclosure statement and, to that purpose, became familiar with the operations' patterns of the Debtor. Furthermore, he participated in the preparation process of the Chapter 11 Plan, reviewed the Monthly Operation Reports, and developed the basis for the projections, evaluating the cash flow of the Debtors and the entity's ability to pay. Mr. Aquino asserts that the company can meet the commitment of the plan and that creditors are better protected if the corporation continues to operate. The financial projections attached to the Disclosure Statement at Docket No. 364 were admitted as Exhibit 1. Mr. Aquino stated that the assumptions made in the projections are reasonable and conservative, based on the business patterns of previous years, specifically a 17% increase in new licenses although the increase during the last 3 years was of 264%. He explained that, for example, he evaluated information from the internet which stated that in Puerto Rico there are 700 hotels and took the information in consideration to sustain the projections to increase the licenses for hotels. The witness opined that the plan projections demonstrate feasibility.

On cross examination, Mr. Aquino was questioned regarding the assumption made in the projections that consider that all the current licenses would be renewed.[1] The witness stated that the assumption was based on the experience of the business, since the inclusion of Mr. Alan McAbee to the corporation. He testified that, since the participation of Mr. McAbee, every license has been renewed yearly although the projections show that from 2014 to 2015, 10 licenses were not renewed. However, the witness did not consider the reduction because it occurred before the participation of Mr. McAbee in the businesses' operations. When queried as to the historical fluctuation in the numbers of licenses through the period shown on the chart, the witness admitted that the number of licenses varies although the projections show that the Debtor will not lose any licenses for the next five (5) years.

When presented with the Liquidation Analysis included in the projections[2], the witness was questioned if the analysis reflected the reality of the corporation "now" and the witness acknowledged that the analysis was as of March 2017, and therefore, did not reflect Debtor's current available cash. Mr. Aquino testified that if the company was liquidated "today" the

---

[1] Docket No. 364-2, p. 25 of 33
[2] Docket No. 364-2, p. 32 of 33

-24-

Creditors will receive a greater amount of cash, approx. $80,000.00. The witness acknowledged that it would be more relevant for Creditors to know what the amounts are "today" than the amounts dated back to the moment of the filing. Mr. Aquino admitted that all the asset values in the Liquidation Analysis are a year old. Mr. Aquino also declared that the real estate property was not appraised and that the value included in the analysis was based on the management's opinions.

The witness opined that the corporations have no intangible assets and that the logo of the company has no worth if disconnected from the licenses. He further stated that in accounting, the logo is an expense and, therefore, no value needs to be assigned to it. The witness declared that "the right to exploit" ACEMLA's logo, in his opinion, has no value if the company was liquidated under a market test, considering the circumstances in which ACEMLA operates, as ACEMLA is not the owner of the licenses it administrates. The value of its logo is tied to the value of the Portfolio, because the Portfolio is what gives it the capacity to do business. Therefore, Mr. Aquino concluded that the ACEMLA's current eighty-two (82) venue licensing contracts have no value because the licenses are owned by a third party. The witness declared that when a business is sold the value of the company is the "going concern". ACEMLA does not have the ability to operate indefinitely because it is not the owner of the Portfolio. Therefore, the "asset" that generates $400,000.00 a year is not included in the Liquidation Analysis, as ACEMLA is not the owner of an asset and just represents the owner of the licenses. The witness declared that the value of the company is "the going concerns" exclusively based on sales. Furthermore, Mr. Aquino testified that the right to the administration contract is not included in the liquidation analysis, although admitting that the contract is the primary asset of ACEMLA, which allows it to operate. For this reasons, the "going concern value" was subtracted in the liquidation value analysis.

Furthermore, the witness was questioned regarding the "notes receivable" of $103,200.00 disclosed in the liquidation analysis that is later subtracted as a "going concern". Mr. Aquino explained that he was not aware of an account receivable for that amount and clarified that the "notes receivable" was an incorrect label included in the analysis and corresponded to an incorrectly assigned "value" to the licensing agreements in a previous report that he had not prepared. Mr. Aquino clarified that if the portfolio was property of the Debtors, then, based in its volume, a value could be established. However, the witness stated that, in his opinion, it was not necessary to conduct a market analysis to determine if the intangible assets had any value.

-25-

Mr. Aquino was questioned about the "accounts receivable" included in the "Projected Cash Balance Available"[3]. The witness testified that the projections assume that all of the account receivables would be paid during 2018. The doubtful account reserve is limited to a 2.1% of the receivables, considering that the past experience of the corporation has been that a "very little amount" of receivables are lost. Therefore, the projections assume that a 97.9% of the accounts receivable are going to be collected. However, Mr. Aquino clarified that, to make that assumption, he only reviewed years 2015 and 2016, because management changed in 2016 and the years before are, in his opinion, not comparable. Furthermore, Mr. Aquino testified that he was not aware of how much of the receivables were more than ninety (90) days past due. The Operating Report for January 2018 was showed to the witness[4]. The amount of receivables more than ninety (90) days old was $59,761.66. The witness was not able or unwilling to answer clearly if, in his experience, a ninety (90) days past due receivable could be collected at a 90% rate.

Mr. Aquino further declared that he did not perform an analysis of potential causes of action against any party, preferential payments or fraudulent transfers.

Mr. Aquino testified that the owner of the licenses and the portfolio is Ms. Dolores Vera and that he had no knowledge as to how she became the owner. Mr. Aquino couldn't state if the portfolio was previously owned by ACEMLA. He declared that ACEMLA and Ms. Vera have a contract that allowed ACEMLA to collect from the licenses. However, the witness stated that, other than a salary as an employee of the company, Ms. Vera received no other consideration from ACEMLA.

The witness declared that, when estimating the renewal of the licenses, he did not review any current negotiations and did not saw any new contracts but that he discussed them with Mr. Alan McAbee and had "seen" the cash when it arrived to ACEMLA. Other than his personal experience of visiting hotels and restaurants, no market analysis was performed relating the venues and the compositions, to determine the projections for new licenses. The witness attested that he had no knowledge of how many compositions ACEMLA had a right to license. Furthermore, Mr. Aquino had no knowledge of how many compositions were owned by ACEMLA or how many

---

[3] Docket No. 364-2, p. 12 of 33

[4] Docket No. 377, p. 8 (Exhibit A for the Creditors)

-26-

compositions the Debtor was just authorized to administer. The witness further declared that his work was performed based on the representations made by ACEMLA's officers.

The witness acknowledged that the composers are receiving a 6% of the receivables. Mr. Aquino declared that he did not perform any market analysis, other than the actual payment made by ACEMLA to its composers, to analyze if the 6% is consistent with new market standards. Aditionally, Mr. Aquino didn't review any contracts to confirm that the 6% paid to composers is the actual amount agreed upon, and to verify if ACEMLA is in default with the composers. Furthermore, the 6% projection assumes that the amount paid to the composers today will continue invariable for the next five (5) years.

Initially, Mr. Aquino could not remember the source of $98,704.36 disclosed as *Receipts-Others* in the "Summary of Monthly Operation Report"[5], although admitting that it should be an important fact to recall. He expressed having no knowledge to state if it was a capital contribution from the Fideicomiso del Compositor Puertorriqueño ("Fideicomiso"). However, Mr. Aquino testified that, if the amounts were withdrawn from the receivables, the cash balance of ACEMLA would've been negative and confirmed that the receipts are not part of the regular operation of the Debtor from March 2017 to December 2017. When confronted with Exhibit A[6], in which a similar amount is listed as provided by the Fideicomiso, the witness declared that the amount was not a capital contribution, but a loan that was made by ACEMLA to the Fideicomiso, and which had been paid back to ACEMLA. The Witness admitted that without the payment made by the Fideicomiso, the revenue projection of $40,000.00 monthly could not be accomplished. Aditionally, although declaring that the amounts were owed by the Fideicomiso prior to the filing of the petition and paid after the filing, the witness could not identify the receivable in Schedule A/B, admitted as Exhibit B, and ascertained that the Schedule was incomplete. Furthermore, the receivable was not included in the Liquidation Analysis, although Mr. Aquino had stated that the analysis was prepared as of March 2017. Mr. Aquino testified that he obtained the amount of the Fideicomiso loan from the general ledgers of the corporation but admitted not reviewing any loan documents. However, based on the collection, the witness assumed it was a valid note.

---

[5] Docket No. 364-2, p. 33 of 33
[6] Docket No. 337-1, p. 3 of 52

Mr. Aquino further declared that the account receivables on page 12[7] of the projections pertain to the municipalities and the University of Puerto Rico, although previously testifying that the receivables pertain to hotels and restaurants. He clarified that most of the balance of receivables was due by the University of Puerto Rico, the Municipality of Caguas, and other smaller venues. Mr. Aquino did not consider that the University of Puerto Rico is part of the insolvency process of PROMESA and he was unable to indicate if the Debtor filed a Proof of Claim for the receivables in the PROMESA case.

Based on the witness' testimony, the court finds that the foundation of the projections is not sustained by sufficient and reliable data. The court further finds that the witness was unable to support his testimony and the projections with clear underlying information and that the testimony, rather than providing clarity, raised questions as to the analysis made by the Debtor in support to its Proposed Disclosure Statement. The court finds that there are substantial contradictions between the documents reviewed by Mr. Aquino, such as the Monthly Operating Report and the Debtor's schedules, with the projections included in the Proposed Disclosure Statement. The court further finds that the 98% receivables' recoup included in the projections seems unrealistic and, therefore, the Proposed Disclosure Statement fails the "adequate information" requirement.

The testimony of Mr. Alan McAbee, the General Manager of the Debtor, made no substantial contribution to support the projections presented by ACEMLA, as part of the Proposed Disclosure Statement. Mr. McAbee testified that he started as a business development advisor, and in January 2017, he became the General Manager of LAMCO and ACEMLA. He is a management consultant and international business development advisor and stated that he had 17 to 20 years of experience working in the entertainment industry. Mr. McAbee's testimony was depthless, making general assertions of his capacity to improve ACEMLA's businesses but, however, not supporting the assertions with reliable data or concrete proposals that could support or enhance the projections included in the Proposed Disclosure Statement. Furthermore, Mr. McAbee's testimony was overly positive however vague and unclear. The witness initially affirmed that "without LAMCO there is no ACEMLA", but later altered his testimony, asserting that ACEMLA could reorganize without LAMCO considering that LAMCO was unable to present a confirmable plan within the requirements of section 1123. Aditionally, the witness' testimony regarding the importance of the

---

[7] Docket No. 364-2, p. 12 of 33

ownership of the Portfolio was evasive and contradictory. No explanation was provided as to why ACEMLA transferred the Portfolio to Ms. Vera for no consideration, and how the transfer benefited ACEMLA and/or LAMCO and/or how the Debtor can ensure that Ms. Vera's contract will remain in full effect for reliable reasons other than the "loyalty" of Ms. Vera to the company.

### d. *The Debtor's Proposed Disclosure Statement*

As established during the testimony of the witnesses, the entire operation of ACEMLA depends on a music Portfolio transferred by LAMCO to Ms. Dolores Vera in 2003, by the *Transfer and Sale of Copyrights Assets* admitted as Exhibit C[8]. However, in the *Description and History of the Debtor's Business* contained in the Proposed Disclosure Statement no details of the transaction is included nor any reference to the contract, its continuation and/or relevance to ACEMLA's operation. Furthermore, the Disclosure Statement fails to describe and explain clearly the interaction between ACEMLA, as a performance rights organization and LAMCO as a publisher. The Proposed Disclosure Statement fails to make any description of the interaction of the companies with each other, and/or how they interact with the Owner of the Portfolio. "Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face." In re RADCO Props., Inc., 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009) The contract that provides ACEMLA the right to administer the songs is not even mentioned in the Disclosure Statement.

Furthermore, the Debtor's Proposed Disclosure Statement fails to consider that the agreement with Ms. Vera contains exceptions and conditions to the right to collect on the licenses and failed to disclose or asses how it may affect ACEMLA's operations in the future, if Ms. Vera intended to implement any of the conditions included in the contract. For example, the contract states that: "[i]n the event [the] Publisher shall fail to account and make payments hereunder in accordance with the terms and provisions hereof, [the] Owner shall have the right, in addition to its other rights and remedies at law or otherwise, to terminate this agreement for good cause, as provided in paragraph 6 above."[9] Although the witnesses admitted that Ms. Vera had never collected any amounts in relation to the contract since 2003, the Debtor failed to address in the

---

[8] Docket No. 19 of administratively joint case 17-2023, Exhibit 5.
[9] Docket No. 19 of administratively joint case 17-2023, Exhibit 5 at P. 19.

Proposed Disclosure Statement the matter. Aditionally, the Disclosure Statement fails to disclose any negotiations of the terms of the agreement and/or modification that may guarantee the operation of ACEMLA. The "loyal relationship" between the officers of the company, mentioned by Mr. McAbee, is not a sufficient guarantee for creditors and can't cure or substitute the failure to disclose any of the risks related to the agreement with Ms. Vera.

Furthermore, the witnesses stated that the agreement with Ms. Vera could not be transferred by ACEMLA, and therefore, the agreement had no value to the company. However, the court references Paragraph 9 of the contract which states that "…the Publisher shall not have the right to assign any of its rights hereunder to any person, firm or corporation without Owner's prior written consent…" Therefore, the contract provides for a limited possibility of a transfer, under conditions agreed upon with the Owner. The Debtor fails to make any analysis to explain why the bargaining position of LAMCO with respect to the contract has a $0.00 value, and why it was not disclosed in the liquidation scenario. The court agrees with the objecting creditors when stating that the liquidation analysis is flawed. The testimony of the witnesses evidenced that the information used to prepare the liquidation analysis is lacking and/or outdated.

Furthermore, the Debtor makes a vague assertion about the *Procedures Implemented to Resolve Financial Problems* in the Proposed Disclosure Statement arguing that the Debtor had attempted to negotiate with creditors. However, no description as to procedures or changes in the corporation's operation is included. Although ACEMLA admits that its current financial problems are related to unfavorable judgments against the corporation, some of which were initially pursued by ACEMLA itself, no explanation is provided on how to avoid future unfavorable litigation, or if the projections consider a reserve for any copyright infringement litigation that may have a negative result and an unfavorable monetary judgment. The Debtor admitted that infringement actions are necessarily enforced through litigation, and the Debtor's General Manager, Mr. McAbee, testified that the importance of the relationship between ACEMLA and LAMCO is that LAMCO provides ACEMLA the right to sue. However, the Proposed Disclosure Statement fails to address the impact of any future litigation in the operation of the Debtor.

When discussing the *Current and Historical Financial Conditions* in the Disclosure Statement, the Debtor states that "[a]ccording to the monthly operating reports, Debtor will be able to make the proposed Plan. This summary of the Monthly Operating Reports starts from March

-30-

2017 until 2017. At the end of the period of March 31, 2017, the amount left after disbursements was $3,794.86; at the end of September 30, 2017 the amount left after disbursements was $128,550.93; at the end of October 31, 2017, the amount left for disbursements was $115,992.37; at the end of November 30, 2017, the amount left after disbursements was $115,992.37; at the end of December 21, 2017, and the amount left for disbursements was $63,409.36." However, Mr. Aquino testified that the Monthly Operation Reports included the amount paid to ACEMLA by the Fideicomiso, in repayment for a loan in the amount of $98,000.00, which is not part of the regular operation of ACEMLA. He further admitted that if the Fideicomiso's repayments was subtracted, ACEMLA could not obtain the projected revenue.

In view of the foregoing, the court denies the final approval of the Debtor's Disclosure Statement.

### e. *Non-Consensual Confirmation Pursuant to §1129 (b) and the Absolute Priority Rule*

The Proposed Disclosure Statement states, as to the *Equity Interest,* that the "Fideicomiso" will retain its equity interest but will not receive any payments under this plan until all senior creditors have received all their payments". Aditionally, secured creditor Luis Raúl Bernard is described as an insider in the Proposed Disclosure Statement and its proposed treatment is the following: "[s]ecured creditor Luis Raúl Bernard's security interest stems from several monetary deposits made to boot Debtor's business for a total amount of $235,303.00. Debtor will not be making payments in relation to this debt until after payments to all creditors are satisfied".

A chapter 11 plan may be confirmed over the objection of a dissenting class if three principal requirements are met: (1) the standards in § 1129(a) are satisfied, except for § 1129(a)(8) which provides for acceptance by all impaired classes; (2) the plan does not discriminate unfairly against any impaired class that has not accepted the plan; and (3) the plan is fair and equitable with respect to all impaired classes that have rejected confirmation. See In Re Melendez Pérez, No. 12-03808 (ESL), 2015 Bankr. LEXIS 1488, 2015 WL 2065276 (Bankr. D.P.R. May 1, 2015). The objecting creditors allege that the chapter 11 plan in the present case is not "fair and equitable" pursuant to 1129(b)(2)(B)(ii), as the Proposed Disclosure Statement asserts that the Fideisomiso will retain its equity interest, and, therefore, failing to comply with the absolute priority rule.

There are two alternatives for compliance to § 1129(b)(2)(B): the plan must provide the claim holders of the dissenting class a value, as of the effective date of the plan, equal to the allowed amount of the claim, that is, the present value, § 1129(b)(2)(B)(i); or no junior claim or interest receives or retains any property on account of its claim or interest, § 1129(b)(2)(B)(ii). In order to satisfy the fair and equitable standard and the absolute priority rule, the plan must not provide for the distribution or retention of property by anyone whose claim or interest is junior to the dissenting class, such as equity holders.

"Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property". Whether the value is "present or prospective, for dividends or only for purposes of "control" a retained equity interest is a property interest to "which the creditors [are] entitled … before the stockholders [can] retain it for any purpose whatsoever."" Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 207-208 (1988), *citing* Northern Pacific R. Co. v. Boyd, 228 U.S. 554, 508 (1912).

On its *Statement Pursuant to 11 U.S.C. §1129(b) Cram Down* at Docket No. 412, Paragraph 29, p. 16-19, the Debtor argues:

> *29. 11 U.S.C. 1129(b)(2)(B) Unsecured Claims/Absolute Priority Rule*
>
> a) *The Code provides that with respect to a dissenting class of unsecured claims, in order for the plan to comply with the absolute priority rule, such claims must be paid in full or*
>
> > *(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.*
> >
> > *11 U.S.C. 1129(b)(2)(B)(ii).*
>
> b) *In other words, if the objecting unsecured class is impaired, then it must be paid in full, or no junior classes may receive anything under the plan. "[A] plan may not give property to the holders of any junior claims [], unless all classes of senior claims either receive the full value of their claims or give their consent."* In re Lindsey, *453 B.R. 886, 892 (2011, E.D. Tenne[s]see).*
>
> > *The absolute priority rule demands that the holder of any claim of interest that is junior to the claims of an impaired class may not receive or retain the plan on account of such junior claim or interest in any property.*
> >
> > In re Lee Min Ho Chen, *---B.R.---(2012, D. Puerto Rico), 2012 WL 5463256, Page 4, Case No. 11-08170 BKT.*

c) *"Congress decreed that, even in cramdown, an individual debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section." In re Shat, 424 B.R. 854, 862 (2010).*

d) *When first enacted the absolute priority rule had the purpose of granting protection to creditors in business reorganizations under chapter 11. In re Lee Min Ho Chen, Page 5.*

e) *The Circuit Courts disagree on whether to apply a broad or narrow interpretation of the "absolute priority rule". This disparity came to be in the year 2005, when Congress amended this disposition, after the Bankruptcy Abuse Protection Act ("BAPCPA").*

f) *The Bankruptcy Court for the District of Kansas applied the broad interpretation of this rule stating that a narrow interpretation wouldn't be consistent with the purpose of individual reorganization under Chapter 11. In re Roedemeier, 374 B.R. 264, 275 (2007). This view was confirmed by the Bankruptcy Court for the District of Nevada, expressing that the broad interpretation is "consistent with the view that the principal purpose of the Bankruptcy Code, to grant a fresh start to the honest but unfortunate debtor". In re Shat, 424 B.R. 854, 866 (2010).*

g) *Very recently, on November 9, 2012, the Bankruptcy Court for the District of Puerto Rico rejected the application of the broad interpretation. It was stated that*

> *[t]aking both interpretations into consideration, this court finds the reasoning and the logic behind the narrow approach the most compelling. Therefore, this court concludes that the absolute priority rule still applies to individual chapter 11 debtors.*
>
> *In re Lee Min Ho Chen, ---B.R.---(2012, D. Puerto Rico), 2012 WL 5463256, Page 3, Case No. 11-08170 BKT.*

h) *Accordingly, in order to apply the cramdown, it was held that "if a [debtor in possession] wants to confirm a plan that includes retaining equity ownership, it will either have to pay the creditors in full or negotiate for their cooperation." In re Lee Min Ho Chen, Page 4.*

i) *In Lee Min Ho Chen, the Court concluded that the individual Chapter 11 debtor did not comply with the absolute priority rule. Specifically, debtor proposed a plan in which she would retain most of her interest in prepetition property and pay general unsecured creditors a 0.0492% dividend. In re Lee Min Ho Chen, 2012 WL 5463256, Page 10.*

j) *Debtors, contest that their plan complies with the requirements of this section.*

k) *The case at hand is substantially different from In re Lee.*

l) *In the first hand, Debtor, proposes to pay general unsecured creditors a 25%dividend, while the debtor in In re Lee proposed to pay 0.0492%.*

m) *The Monthly Operating Reports reflect that Debtors are capable of funding the plan.*

n) *The Plan's projections reflect Debtors' projected income accurately.*

o)  *The projections reflect that Debtors will be able to fund the Plan with the revenue of the current and future license agreements.*

p)  *The Plan, proposes to pay using all of Debtors' disposable income.*

q)  *The Plan complies with all of the requirements set forth in section 1129(a), except subsection (8).*

r)  *The Plan complies with the cramdown.*

s)  *Debtors comply with the absolute priority rule.*

t)  *As stated in the case, when applying the cramdown exception, the absolute priority rule requires that no interest be retained over the reorganized business, unless senior class accepts the plan or is paid in full satisfaction of its debt. In re Lee Min Ho Chen, 2012 WL 5463256, Page 4.*

u)  *Debtor has complied with the Absolute Priority Rule.*

The court finds the Debtor's allegations puzzling. Although acknowledging that the unsecured creditors will receive a 75% reduction on their claims, the Debtor asserts it complies with the absolute priority rule, which requires "that no interest be retained over the reorganized business, unless senior class accepts the plan or is paid in full satisfaction of its debt".

The court agrees with the objecting creditors that the Proposed Disclosure Statement and chapter 11 plan fails to comply with the absolute priority rule, and, therefore, the Proposed Disclosure Statement cannot be finally approved, and the chapter 11 plan cannot be confirmed.

### f.  *Conversion or Dismissal Under Section 1112(b)*

Considering that a plan cannot be confirmed within the timeframe required by sections 1121(e) and 1129(e), and that the Debtor failed to comply with the requirements of section 1121(e) for an extension of time (*see* Docket No. 268), cause exists pursuant to section 1112(b)(1) and 1112(b)(4)(J) to convert or dismiss the case. "When an interested party files a motion to convert or dismiss a [c]hapter 11 case, the bankruptcy court inquires as follows: Does 'cause' exist to convert or dismiss the case; and, if so, is conversion or dismissal in the best interests of creditors and the estate?" Hoover v. Harrington (In re Hoover), 828 F. F.3d 5, 8 (1st Cir. 2016). The bankruptcy court has "broad discretion" to determine if conversion or dismissal is in the best interests of creditors and the estate. *Id.* at 10; *see also* In Re Andover Covered Bridge, LLC, 553 B.R. 171 (B.A.P. 1st Cir. 2016).

-34-

Even though the Bankruptcy Code does not define the phrase "best interest of the creditors and the estate", courts have typically considered the following factors to determine whether dismissal or conversion is in the best interest:

> (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a "single asset," (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a plan has been confirmed and whether any property remains in the estate to be administered, and (10), whether the appointment of a trustee is desirable to supervise the estate and address possible environment and safety concerns.

In re Costa Bonita Beach Resort, 513 B.R. 184, 200-201 (Bankr. D.P.R. 2014), *citing* Collier on Bankruptcy, ¶ 1112.04[7] (16th Ed. 2011).

In essence, "the court should evaluate and choose the alternative that would be most advantageous to the parties and the estate as a whole." *Id.*

Peer, SBS and BMI requested the conversion of the Debtor's case to chapter 7, which the Debtor objected, and the Tite Curet Estate requested the dismissal of the case and a bar to re-file for a period of at least two (2) years.

Based on the record, the court finds that the creditors are not likely to receive a dividend upon liquidation and that, therefore, dismissal is in the best interest of the creditors. The music Portfolio is not owned by ACEMLA or LAMCO since 2003 and the Debtor's capacity to generate any income is based, exclusively, in the contractual relationship with the Owner of the Portfolio. Furthermore, the only real estate owned by ACEMLA is totally encumbered. However, considering that the Debtor is a repeat filer and that the record shows that it has been trying to avoid or delay payment to judgment creditors through the bankruptcy proceedings, the court grants

the Tite Curet Estate's requests, and bars the Debtor to refile for a period of two (2) years in order to prevent an abuse of the bankruptcy process.

Conclusion

The Proposed Disclosure Statement fails to comply with the "adequate information" requirement and, therefore, the chapter 11 plan cannot be confirmed. Cause exists to convert or dismiss pursuant to 11 U.S.C §1112(b)(1) and §1112(b)(4)(J). The court concludes that dismissal with a bar to refile for a period of two (2) years is in the best interest of creditors as unsecured creditors are not likely to receive a dividend upon liquidation. All other requests not addressed herein are rendered moot.

SO ORDERED.

In San Juan, Puerto Rico, this January 22nd, 2019.

Enrique S. Lamoutte
United States Bankruptcy Judge